IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LYNN MCCALLUM, | CASE NO. 1:14-cv-00667-JEJ-GBC |
| Plaintiff, | (JUDGE JONES) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 5, 6, 7, 8, 10 |

## REPORT AND RECOMMENDATION

### I.      Procedural Background

On June 27, 2011, Lynn McCallum ("Plaintiff") filed an application as a claimant for Social Security Insurance under Title XVI of the Social Security Act with an alleged disability onset date of April 30, 2011.  (Tr. 82-83, 113-114). After Plaintiff's claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on August 1, 2012.  (Tr. 41-57). On October 25, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 24-40)).  Plaintiff sought review of the unfavorable decision (Tr. 22-23) which the Appeals Council denied on February 12, 2014, thereby affirming the decision of the ALJ as the "final decision" of the

Commissioner.  (Tr. 1-6).

On April 7, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On June 3, 2014, the Commissioner ("Defendant") filed an answer and administrative transcript of proceedings.  (Docs. 5, 6).  On July 15, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief") (Doc. 7).  On August 13, 2014, Defendant filed a brief in response ("Def. Brief") (Doc. 8).  On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge.  On November 17, 2014, Plaintiff informed the Court that a reply brief would not be filed.  (Doc. 13).

## II. Relevant Facts in the Record

Plaintiff was born on May 18, 1970, and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on October 25, 2012.  20 C.F.R. § 404.1563 (c); (Tr. 434).  Plaintiff completed the tenth grade and last worked as a cashier.  (Tr. 35, 45-46).  She lives with her adult daughter and her boyfriend.  (Tr. 48).  Plaintiff receives food stamps and has access to government subsidized health care.  (Tr. 46).

## A. Relevant Treatment History and Medical Opinions

### 1.  Neurology Center: Matt Vegari, M.D.; Fuhai Li, M.D.; Ralf Van Der Sluis, M.D.; Adel B. Mikhaiel, M.D.; Nathan Carr, PA-C;  and, Amanda Beck, PA-C. [1]

The doctors from the Neurology Center treated Plaintiff from 2010 to 2012. (Tr. 209-292, 426-440).  In an initial consultation record dated August 6, 2009, Dr. Li recorded Plaintiff's medical history which included that her back pain started approximately eight years prior when she injured herself while working as a nurse's aide.  (Tr. 215).  Plaintiff reported that she had back surgery in 2002 and subsequently tried different treatments including physical therapy, and epidural injection, which did not help.  (Tr. 215).  Plaintiff tried pain medications including Percocet, which did not alleviate the pain and she said over the last couple of years, she was seen by Dr. Black who started her with Vicodin 1 tablet 4 times a day which initially alleviated the pain, but recently, the pain had worsened.  (Tr. 215).  Plaintiff reported pain shooting down her right leg with associated numbness and weakness in her right leg.  (Tr. 215).  Plaintiff also reported numbness in her right hand, weakness on the right side, difficulty holding cups, numbness on the right two fingers, pain in her right wrists, and severe headaches two to three times per week.  (Tr. 215).

---

[1] Mr. Carr and Ms. Beck are physician assistants working under the supervision of Dr. Vegari.

Dr. Li found that Plaintiff's cranial nerve examination was normal.  (Tr. 217).  In assessing Plaintiff's motor abilities, Dr. Li observed a "mild pronator drift on the right upper extremity," muscle strength of 4+ out of 5 for both right upper and lower extremities, normal muscle tone, normal muscle bulk, and no fasciculation or tremor.  (Tr. 217).  Dr. Li also observed decreased sensation to pinprick on the right index and middle finger, antalgic gait, focal tenderness in the paraspinal region at the level of L3-L5, and positive bilateral straight leg raise test. (Tr. 217).  Dr. Li assessed Plaintiff with right hemiparesis to rule out possibility of intracranial lesion, migraine headaches, L5 radiculopathy to rule out HNP, failed back surgery syndrome, right carpal tunnel syndrome, and bipolar disorder.  (Tr. 217).

In a treatment record dated November 2, 2009, Dr. Li noted that a recent brain MRI demonstrated "a few small T2 hyperintense foci in the subcortical white matter, which was nonspecific" and her lumbar MRI demonstrated "disc herniation at the level of L2-3, L3-4 and L4-5" and narrowing of neural foramina at the level of L2-3, L3-4, and L4-5.  (Tr. 213, 285-286).  Plaintiff reported that the prescribed Vicodin caused nausea and that she was involved in a motor vehicle accident three to four days prior which had exacerbated her back pain.  (Tr. 213).  Plaintiff described her back pain as sharp pain shooting to the right leg with associated

numbness.  (Tr. 213).  Dr. Li observed that there was focal tenderness in the paraspinal region at the level of L4 to S1 and otherwise, the examination was unremarkable.  (Tr. 213).  Dr. Li assessed Plaintiff with migraine headaches, L5 radiculopathy secondary to HNP, failed back surgery syndrome, right carpal tunnel syndrome, and bipolar disorder.  (Tr. 213-214).  Dr. Li prescribed Percocet for pain and recommended physical therapy three times a week for six weeks.  (Tr. 214).

In treatment records dated November 19, 2009, and November 20, 2009, Dr. Van Der Sluis concluded that Plaintiff had a normal Needle EMG of both upper extremities and the left lower extremity while finding that Plaintiff had an abnormal Needle EMG of the right lower extremity which was  most consistent with right L5 root irritation of a subacute nature.  (Tr. 224, 227).

In a treatment record dated January 12, 2010, Plaintiff reported that her medication change helped with her pain and her headaches had been stable.  (Tr. 212).   Dr. Li noted that Plaintiff's recent EMG study demonstrated L5 radiculopathy.  (Tr. 212).  Dr. Li assessed Plaintiff with migraine headaches, L5 radiculopathy secondary to HNP, failed back surgery syndrome, right carpal tunnel syndrome, and bipolar disorder.  (Tr. 212).

In a treatment record dated April 12, 2010, Plaintiff reported that the current medications improved her migraine headaches problem had become stable while

her back pain had increased. (Tr. 211). Plaintiff's examination was generally unremarkable with exception to Dr. Li noting focal tenderness in the paraspinal region at the level of L4 through S1. (Tr. 211). Dr. Li assessed Plaintiff with migraine headaches, L5 radiculopathy secondary to HNP, failed back surgery syndrome, right carpal tunnel syndrome, and bipolar disorder. (Tr. 211)

In a treatment record dated July 12, 2010, Mr. Carr noted that Plaintiff reported experiencing headaches with lower back pain and discomfort ever since she underwent a discectomy at the L5-S1 level in approximately 2006. (Tr. 209). Plaintiff reported pain at the right lower extremity and Mr. Carr noted that a recent EMG demonstrated L5 nerve root irritation. (Tr. 209). Plaintiff reported continued pain and headaches despite trying different medications. (Tr. 209). Mr. Carr noted that Plaintiff had not had a recent urine toxicology screening. (Tr. 209). Mr. Carr observed that Plaintiff had normal motor strength in the upper and lower extremities noting a slightly diminished toe dorsiflexion on the right; her reflexes were 2/4 throughout, and; Plaintiff has a steady gait, and normal coordination testing without ataxia or dysmetria. (Tr. 209). Her medication was changed. (Tr. 209).

Laboratory results from a urine sample collected on November 9, 2010, and on June 28, 2011, suggest that Plaintiff was noncompliant with her Oxycodone

prescription, however, there does not appear to be any documentation from a treating physician addressing these test results.  (Tr. 219, 262).

In a treatment record dated December 17, 2010, Mr. Carr noted that Plaintiff had not followed-up since July and therefore had not filled prescriptions.  (Tr. 287).  Plaintiff reported continued severe neck pain with bilateral radicular pain into the scapular region.  (Tr. 287).  Upon examination, Mr. Carr observed mild cervical paraspinal muscle spasm, left and right lateral rotation of 45 degrees, facet tenderness in the C5-6 and C6-7 region, and multilevel cervical root tenderness, C5-6 and C6-7.  (Tr. 287).  Mr. Carr observed that Plaintiff's gait was normal, all cranial nerves were intact, her motor strength was 5/5 in the upper and lower extremities with exception of grip strength of 4+, and had normal tone.  (Tr. 287). Plaintiff's reflexes were 3/4 throughout, Tinel and Phalen sign were positive bilaterally.  (Tr. 287).  Mr. Carr ordered further testing to explore the possibility of cervical spine pathology, noting the failed conservative measures over many years. (Tr. 288).

Treatment records from March 31, 2011, and May 31, 2011, read verbatim to the December 2010 treatment record to the extent that parts of the record appear to be erroneously copied.  *Compare* (Tr. 287) *with* (Tr. 289) *and* (Tr. 291) (all stating "She has not followed-up since July and therefore has not had prescriptions

filled."). The examination observations remain unchanged from the December 2010 examination. (Tr. 287-292).

On February 15, 2012, Dr. Vegari submitted a Residual Functional Capacity ("RFC") assessment form. (Tr. 426-433). Dr. Vegari opined that Plaintiff: 1) could frequently and occasionally lift and/or carry less than ten pounds; 2) could stand and/or walk less than two hours in an eight-hour workday; 3) could sit less than six hours in an eight-hour workday; and, 4) was limited with all upper and lower extremities in ability to push and/or pull (including operation of hand and/or feet controls). (Tr. 427). Dr. Vegari explained that the limitations were due to cervical and thoracic discs in contact with the spinal cord. (Tr. 427). Dr. Vegari further opined that Plaintiff could occasionally (less than one third of the time): 1) climb (ramp, stairs, ladder, scaffolds; 2) balance; 3) stoop; 4) kneel; 5) crouch; and, 6) crawl. (Tr. 428). Vegari opined that Plaintiff had an unlimited ability to: 1) reach in all directions, including overhead; 2) handling (gross manipulation); 3) fingering (fine manipulation); and, 4) feeling. (Tr. 429). Dr. Vegari opined that Plaintiff had no visual, communicative, or environmental limitations. (Tr. 429-430).

After the October 2012 ALJ decision, Plaintiff submitted additional treatment records which the Appeals Counsel reviewed. Def. Brief at 7. In a

treatment record dated August 13, 2012, Plaintiff reported experiencing headaches three to four times a week with nausea, sensitivity to light and sound, blurred vision and dizziness. (Tr. 437). Plaintiff reports continued neck and back pain that radiates into her upper and lower extremities bilaterally with parasthesias. (Tr. 437). Ms. Beck observed moderate cervical paraspinal, cervical, trapezius, thoracic paraspinal, and lumbosacral paraspinal muscle spasms; limitation of neck movement to both horizontal planes; left and right lateral rotation of thirty degrees; C3-4, C5-6, T3-4, L3-4, L4-5 facet tenderness; multilevel cervical root tenderness, and; mild thoracolumbar scoliosis. (Tr. 437).

In a treatment record dated October 22, 2012, Plaintiff reported continued neck and back pain that radiated into her upper and lower extremities bilaterally with parasthesias and mid-back pain between her shoulder blades. (Tr. 435). Plaintiff reported that the headaches had improved with pharmacotherapy. (Tr. 435). Ms. Beck found that the MRI of the brain was unremarkable. (Tr. 435). Ms. Beck observed moderate cervical paraspinal, cervical, trapezius, thoracic paraspinal, and lumbosacral paraspinal muscle spasms; limitation of neck movement to both horizontal planes; left and right lateral rotation of sixty degrees; C3-4, C5-6, T3-4, L2-3, L3-4, L4-5 facet tenderness; multilevel cervical root tenderness, and; mild thoracolumbar scoliosis. (Tr. 435). Ms. Beck noted that

Plaintiff maintained substantially the same motor strength, reflexes and gait as in the prior examinations. (Tr. 435).

### 2.  Honesdale Family Health Center:  Megan Baumann, P.A.; Eileen Arenson, C.R.N.P.

Plaintiff visited Honesdale Family Health Center for regular medical care including narcotic pain medication. (Tr. 395-415).  In a treatment record dated January 27, 2012, Plaintiff denied experiencing headaches. (Tr. 396).  A treatment record dated June 1, 2011, indicated that Plaintiff experienced back pain. (Tr. 401).  A treatment record dated April 20, 2011, indicated that Plaintiff was out of work from April 18, 2011 through April 20, 2011, due to increased lower back pain. (Tr. 402).

A record from Drayer Physical Therapy Institute dated April 22, 2011, details Plaintiff's current level of function and a plain for Plaintiff's physical therapy to restore back function. (Tr. 416-418).

A treatment record dated March 5, 2011, indicated that Plaintiff had a dermatological reaction the day prior at work where her hands became red due to touching bleach. (Tr. 405).  In a treatment record dated May 14, 2010, Plaintiff reported that the Vicodin was not helping her lumbar condition. (Tr. 412).  A

treatment record dated December 14, 2009, noted that Plaintiff reported back pain and demonstrated spasm, joint paint and joint swelling.  (Tr. 425).

In a treatment record dated March 29, 2011, Ms. Arenson wrote that at the end of appointment, she noticed a letter mandating that no more narcotics to be prescribed to Plaintiff and realized that she had already prescribed narcotics.  (Tr. 403).  Ms. Arenson wrote that she confronted Plaintiff as she was leaving and that Plaintiff replied that she knew nothing of obtaining multiple prescriptions from multiple providers and never got a message from the office regarding the matter. (Tr. 403).  Ms. Arenson explained that since she has already given Plaintiff a prescription that she could not ask for the prescription to be returned, but stated that it would be her last prescription and that the office would not prescribe anymore.  (Tr. 403).

### 3.  Bon Secours Medical Group: Joe A. Cirella, M.D.

On August 8, 2011, Plaintiff visited Bon Secours Medical Group to establish care.  (Tr. 302-303).  She reported a history of having bipolar disorder, but she was not taking any psychotropic medication and had stopped receiving psychiatric care for undisclosed reasons.  (Tr. 302).  Plaintiff reported chronic back pain treated with narcotic pain medication and described weakness on the right side of her body.  (Tr. 302).  On examination, Dr. Cirella found that Plaintiff did not have any

cervical disk protrusion and Plaintiff's neck was tender to the "lightest" palpation and she refused to extend her right leg beyond 30 degrees.  (Tr. 302).  However, she had good muscle tone and normal reflexes.  (Tr. 302).  Moreover, she had no difficulty ambulating and she was wearing high heels.  (Tr. 302).  Dr. Cirella wrote that "[d]ue to her history of evaluation by multiple doctors [he was] reluctant to prescribe narcotics. . ."  (Tr. 303).  Instead, he recommended for her to follow up with sports medicine.  (Tr. 303).

### 4.  Barry Kurtzer, M.D.

On September 15, 2011, Barry Kurtzer, M.D., examined Plaintiff at the request of the agency.  (Tr. 307-10).  Plaintiff reported back, neck, and leg pain despite having had a diskectomy at L5-S1.  (Tr. 307).  Dr. Kurtzer noted that MRIs of Plaintiff's spine showed protrusions and the EMG showed irritation at C-6.  (Tr. 309). On examination, Dr. Kurtzer noted full motion and strength in Plaintiff's upper and lower extremities and a non-antalgic normal gait.  (Tr. 309).  Plaintiff had marked paraspinal tenderness and spasm with pain and decreased lateral rotation bilaterally.  (Tr. 309).  Her reflexes were mildly decreased ("basically within normal limits") and her sensations were normal.  (Tr. 309).

### 5.  Anne C. Zaydon MD: Residual Functional Capacity

On October 6, 2011, Dr. Zaydon reviewed Plaintiff's medical records and opined that Plaintiff could occasionally (one third or less of an eight-hour day) lift and/or carry (including upward pulling) 20 pounds; frequently (cumulatively more than one third up to two thirds of an eight-hour day) lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday, and; had an unlimited ability to push and pull. (Tr. 88-89).   Dr. Zaydon opined that Plaintiff could occasionally climb ramps, ladders, ropes, or stairs and occasionally kneel, crouch, and crawl.  (Tr. 89).  Dr. Zaydon further opinioned that Plaintiff had unlimited ability to balance and stoop and had no manipulative, visual or communicative limitations.   (Tr. 89).   Dr. Zaydon opined that Plaintiff should avoid extreme heat, cold, wetness, humidity, fumes, dusts, and hazards such as machinery and heights.  (Tr. 89).

In support of her conclusions, Dr. Zaydon cited Plaintiff's September 2011 consultative examination with Dr. Kurtzer where it was noted that Plaintiff used Motrin and Flexeril, exhibited cervical and lumbar spasm and tenderness, had a normal gait, and was neurologically intact.  (Tr. 90).  Additionally, Dr. Zaydon cited an August 2011 treatment record with Plaintiff's primary physician wherein Plaintiff reported right arm and leg pain, denied headaches, had carpal tunnel

syndrome in right hand and appeared for the examination wearing high heels while ambulating without difficulty, and had no spasm or atrophy. (Tr. 90). Dr. Zaydon noted a treatment record from May 2011 where Plaintiff reported that the migraines were relieved with medication and examination revealed that Plaintiff exhibited mild cervical spasm and tenderness, was neurologically intact, had nearly full grip strength, had positive Tinel and Phalen results, and a normal gait. (Tr. 90). Dr. Zaydon also cited the results from objective tests revealing degenerative joint disease of the lumbar spine, cervical and lumbar radiculopathy. (Tr. 90).

### III.    Review of ALJ Decision

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more

than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Id.* The ultimate burden of proving disability within the

meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R.

§ 416.912(a).

## A. Allocation of Weight to Medical Opinions

Plaintiff contends the ALJ erred  by not giving controlling weight to the

opinion of Plaintiff's treating physician, Dr. Vegari.  Pl. Br. at 4-11.

The weight afforded to any medical opinion is dependent on a variety of

factors, including the degree to which the opinion is supported by relevant

evidence and consistent with the record as a whole.  20 C.F.R. § 404.1527(c)(3)-

(4).  The opinions of specialists are generally given greater weight than non-

specialists.  The consistency of medical opinions with the record is also significant.

20 C.F.R. §404.1527(c)(4)&(5).

An ALJ should give treating physicians' reports great weight, especially

when their opinions reflect expert judgment based on a continuing observation of

the patient's condition over a prolonged period of time.  *Brownawell v. Comm'r of*

*Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008).  An administrative law judge must

consider all medical findings that support a treating physician's assessment that a

claimant is disabled, and can only reject a treating physician's opinion on the basis

of contradictory medical evidence, not on the administrative law judge's own

credibility judgments, speculation or lay opinion.  *Morales v. Apfel*, 225 F.3d 310,

317-18 (3d Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (The ALJ may not substitute his own judgment for that of a physician).  The regulations require that the Commissioner "give good reasons in [the] notice of determination or decision" for the weight assigned to the treating source's opinion.  20 C.F.R. § 404.1527(d)(2); S.S.R. 96–2p, 1996 WL 374188, at *5.  The failure to provide "good reasons" for not crediting a treating source's opinion is a ground for remand. *See* 20 C.F.R. 404.1527(d)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir.2001) (noting that failure to comply with 20 C.F.R. 404.1527(d)(2) warrants a remand).

However, a treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion.  *Id.* The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled.  *Id.*  Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded.  *Id.*

Medical opinions consisting largely of checked boxes absent of narrative citing to reasons and evidence to support findings are afforded less weight than opinions which include detailed narratives citing to objective medical evidence. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (explaining more weight is given to opinions that include objective medical evidence); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("[F]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *Knox v. Comm'r of Soc. Sec.*, 365 Fed.Appx. 363, 367-67 (2010) (finding that ALJ properly discounted treating physician's check-list opinion because its conclusions were not supported by objective narrative of any specificity.).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination.  20 C.F.R. § 404.1527(d)(1)-(2); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011).  "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."  *Chandler*, 667 F.3d at 361; *Coleman v. Astrue*, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

### 1.  Weight to Opinion of Dr. Vegari, Treating Physician

The ALJ afforded little weight to the opinion of treating physician, Dr. Vegari. (Tr. 35). Substantial evidence supports the ALJ's determination. It does not appear that Dr. Vegari ever personally examined Plaintiff, rather, he signed off on the examinations carried out by his physician assistants. (Tr. 209-292, 426-440). Such goes against the purpose of granting weight a continuing observation of the patient's condition over a prolonged period of time. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). Also, there is no indication that Dr. Vegari saw Plaintiff's medical records from other providers to an extent similar to Dr. Zaydon's review of Plaintiff's medical records.

A treating physician's opinion is only controlling when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in [claimant's] record." 20 C.F.R. § 404.1527(d)(2). As is the case here, the ALJ is entitled to disregard treating physician opinions that are inconsistent with the other substantial evidence in the record, or internally inconsistent. *See Griffin v. Comm'r Soc. Sec.*, 305 F. App'x 886, 891 (3d Cir. 2009).

The record before the ALJ did not contain any treatment notes from Dr. Vegari dated after Plaintiff's April 30, 2011 onset date to support his opinion of

complete disability. The treatment records from his practice group that are most contemporaneous with Plaintiff's April 2011 onset date are treatment records from March 31, 2011, and May 31, 2011, which read verbatim to the December 2010 treatment record to the extent that parts of the record appear to be erroneously copied.  *Compare* (Tr. 287) *with* (Tr. 289) *and* (Tr. 291) (all stating "She has not followed-up since July and therefore has not had prescriptions filled.").   The examination observations remain unchanged from the December 2010 examination.   (Tr. 287-292).   Such verbatim copying often creates internal inconsistencies as well as ambiguities as to whether symptoms persisted or simply remained in the record as a result of copying errors.

The ALJ observed records indicating that Plaintiff was wearing high heels and able to ambulate without difficulty, that she was not cooperative with the full examination and refused to extend her leg past thirty degrees on the right side, Plaintiff was also noncompliant in treatment according to her physical therapy notes from Drayer Physical Therapy Institute, and she had a normal physical examination in January 2012 wherein she denied muscle cramps, joint pain, joint swelling, and back pain. (Tr. 34).  The ALJ noted the September 2011 consultative physical examination  with essentially normal showing that she was able to walk without difficulty, had no need for an assistive device, had full range of motion of

all joints in both upper extremities, but noted to have marked facet tenderness.  (Tr. 34).  The ALJ determined that Dr. Vegari's RFC assessment dated February 15, 2012, was inconsistent with Plaintiff's remaining physical examinations and not supported by Dr. Vegari.  (Tr. 35).

The ALJ detailed Plaintiff's medical record and medical opinions, including observations which demonstrate the severity of Plaintiff's symptoms, Plaintiff's physical and mental limitations, as well as treatment.  (Tr. 31-35).  The ALJ also noted Plaintiff's noncompliance with treatment, lack of cooperation with an examination, and other evidence inconsistent with a finding of disability.  (Tr. 31-35).

Based on the foregoing, the ALJ's allocation of weight to the medical opinions of record is supported by substantial evidence.

## IV.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a

mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: June 26, 2015                              s/Gerald B. Cohn
                                        GERALD B. COHN
                              UNITED STATES MAGISTRATE JUDGE